IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | 8:17CR164 |
|---|---|
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATION |
| FELANDES WILSON, | |
| Defendant. | |

This matter is before the Court on the "Motion to Suppress Warrant, and Request for A *Franks* Hearing" (Filing No. 24) filed by Defendant, Felandes Wilson. Defendant filed a brief (Filing No. 25) supporting his motion and the government filed a brief (Filing No. 35) in opposition.

The Court held an evidentiary hearing on the motion on August 10, 2017, and September 5, 2017. Defendant was present with his attorney, Jessica Douglas. The government was represented by Assistant United States Attorney, Thomas Kangior. Officers Chris Brown and Roman Hutton, both with the City of Omaha Police Department ("OPD"), and Christine Trosper and Abby Kossow, both Nebraska state probation officers, testified for the government.

Transcripts (TR.) of the hearing were filed on September 8 and 12, 2017. (Filing Nos. 51 and 52). The Court granted Defendant's oral request for supplemental briefing. Defendant filed a supplemental brief (Filing No. 53) on September 28, 2017, and on October 18, 2017, the government filed its supplemental brief (Filing No. 56) in opposition. The matter is now fully submitted to the Court.

## BACKGROUND

On June 24, 2015, Defendant was sentenced to three years' supervised probation in Nebraska state court after pleading no contest to possession of more than one pound of marijuana. (Exhibit 3 - Order of Probation; TR. 49). The conditions of Defendant's probation required him to "[a]bstain from the use or possession of alcohol and controlled substances, except by prescription" and also required him to "[s]ubmit to random searches and seizure of [his] person, premises, or vehicle upon request of a probation officer or a law enforcement officer who has been authorized and directed by the probation officer." (Ex. 3). Probation

Officer Trosper began supervising Defendant on his state probation in June 2016. (TR. 100). When Trosper first began supervising Defendant, he lived at an address on Butler Street, but in July 2016, he reported to Trosper that he had moved to 5124 North 51st Street. (TR. 100-101).

On October 14, 2016, Trosper asked her partner, Probation Officer Kossow, to conduct a probation search of Defendant's residence because Trosper was going to be out of the office that day. (TR. 101-102, 118). Defendant reported to Kossow's office sometime before 11:00 a.m. on that date for a scheduled appointment. (TR. 118-119). Kossow testified that Defendant seemed "very calm and laid back" when he arrived, and did not appear to be under the influence of anything. (TR. 119-120). Kossow asked Defendant if he would consent to a probation search of his residence, and he agreed. (TR. 119-120). Kossow called OPD Officers Brown and Hutton to ask for their assistance in the search of Defendant's residence. (TR. 14, 16, 55-56). Kossow advised the officers that Defendant had consented to the search. (TR. 14, 118). Kossow also told the officers that 5124 North 51st Street was the address to be searched. (TR. 59).

Officers Brown and Hutton arrived at Kossow's office wearing jeans, t-shirt, a tactical vest marked "Police," and a police badge. (TR. 16). Officer Brown, Officer Hutton, and Kossow testified that Defendant became agitated and upset when he first observed Brown and Hutton enter the probation office. (TR. 17, 59, 121). Officers Brown and Hutton each testified that they were familiar with Defendant from prior contacts. (TR. 15, 57). In addition, Defendant indicated that he would still consent to the search if a different officer transported him. (TR. 17, 60, 121). Kossow testified that it is procedure to ask for law enforcement to transport probationers. (TR. 120).

OPD Officer Tim Huffman arrived at the probation office to transport Defendant for the search. (TR. 19). Officer Huffman asked Defendant for permission to search his person, and he agreed. (TR. 19). Officer Huffman patted Defendant down and removed approximately $700 in cash and Defendant's car keys from Defendant's pants pocket. (TR. 20, 74). Defendant also gave the officers permission to search the vehicle that he had driven to the probation office. (TR. 61). Officer Huffman and Kossow found approximately $5,500 in cash and a garage door opener in Defendant's vehicle. (TR. 20-21, TR. 74). Officer Huffman handcuffed Defendant before transporting him to the residence for the search. (TR. 35).

Officer Brown testified Kossow informed him that Defendant resided at 5124 North 51st Street, which address Officer Brown confirmed was listed on Defendant's "IMS page" and

driver's license. Officer Brown further testified that MUD provided Defendant's name as the individual responsible for that address's services. Defendant was also listed as the owner with the Douglas County Assessor. However, the residence's OPPD utilities were registered under a woman's name. (TR. 46).

Officers Brown and Hutton drove together in an unmarked cruiser to 5124 North 51st Street. (TR. 21-22). Officer Huffman transported Defendant in his cruiser. (TR. 22). Officer Brown contacted Sergeant George Collins to meet them at the residence. (TR. 40). Sergeant Collins and two other officers were waiting outside the residence when Officers Brown and Hutton arrived. (TR. 22-23).

After arriving at 5124 North 51st Street, Kossow asked Defendant for the easiest way to enter the residence. Defendant told Kossow to use the garage door opener from his vehicle. (TR. 62, 122). Once Kossow opened the garage door with the opener, officers entered the garage and proceeded toward the door that enters the residence through the garage. (TR. 23-24, 123). When Sergeant Collins opened the door to the residence, an audible security alarm started going off. (TR. 25, 62-63, 123). Kossow went to briefly speak with Defendant, who was still sitting in Officer Huffman's cruiser. Officer Brown and Officer Hutton each testified that when Kossow returned, she supplied the code to deactivate the alarm. (TR. 25-26, 63). However, Kossow testified that she believes OPD officers were the ones who shut off the alarm. (TR. 123, 128).

Once the security alarm was deactivated, four to five OPD officers entered the residence. (TR. 24, 27-28). Officer Brown testified that the residence is two stories with a two car garage. (TR. 24, 27). Entry to the residence from the garage (where the officers entered) leads to the basement level of the residence. The second floor is the main level consisting of the kitchen, living room, and bedrooms. (TR. 27). Officer Brown testified that as soon as he entered the residence from the garage, he smelled the strong odor of raw marijuana, which he could tell was emanating from the area by the garage door entrance. (TR. 26). Officer Hutton likewise testified that he smelled raw marijuana as soon as they opened the door to the residence. (TR. 63). Kossow also testified that there was a "very strong odor of marijuana" as they walked into the residence. (TR. 124). Officer Brown noticed that the odor of marijuana dissipated as he proceeded further into the residence. (TR. 27).

Officers Brown and Hutton proceeded upstairs to the main level of the residence, where they saw a digital scale in the kitchen, a heat-sealing machine, and a money counter.

3

(TR. 28, 65). Officer Brown testified that empty heat-sealed bags were found in the garage, labeled with names of different marijuana strains. (TR. 29). Officers Brown and Hutton did not see any marijuana inside the residence, but Officer Hutton testified that the items found in the kitchen are commonly used for packaging marijuana. (TR. 65).

Sergeant Collins began investigating the closet next to the garage door to locate the source of the marijuana odor. (TR. 65). Sergeant Collins also called for a drug canine. (TR. 29). Two K9 Units responded, and one canine was run through the residence.[1] (TR. 30). Sergeant Collins found a piece of loose wood or trim at the bottom of the closet. (TR. 28, 66). When Sergeant Collins moved the loose piece of wood, he saw a heat-sealed plastic bag of what appeared to be marijuana. (TR. 28, 125). Officers believed there was a "false void" in the closet and brought Defendant into the residence to ask him how to access or enter it. Defendant refused. Because the officers believed they would need to damage the closet to enter the "void," they then decided to apply for a search warrant. (TR. 31-32, 69).

Both Officer Hutton and Officer Brown testified that at no point did Defendant indicate he did not want them to search the residence. (TR. 34, 72). Kossow also testified that Defendant never stated he wanted the officers to stop searching. (TR. 127).

Approximately one hour after the canine was run through the residence, Officers Brown and Hutton applied to a Douglas County Court judge for the search warrant. (TR. 33, 81). The Affidavit and Application for the Search Warrant (Exhibit 1; TR. 49) provided:

> On Friday, October 14th, 2016, at approximately 1039 hours Affiant Officers [Brown and Hutton] received a radio call from Nebraska State Probation Officer [Kossow] who advised that she had known 40th Ave Crip gang member [Defendant] . . . inside her office on a probation visit and was requesting assistance to conduct a home visit search of [Defendant's] address of 5124 North 51st Street. Affiant Officers are familiar with [Defendant] from prior contacts and know him to be on probation living at 5124 North 51st Street.
>
> Affiant Officers met with Probation Officer [Kossow] at her office . . . where [Defendant] was already seated in her office. Probation Officer [Kossow] informed Affiant Officers that [Defendant] has a search clause on his residence of 5124 North 51st Street and that he [was] willing to have Officers transport him to his address so that a probation search can be completed. However, upon seeing Affiant Officers, [Defendant] became upset and informed [Kossow] that he was willing to have his

---

[1] The canine officer did not testify and the Court sustained Defendant's objections to questions posed to Officer Brown and Officer Hutton regarding whether the canine alerted or indicated to the presence of marijuana in the closet. (TR. 30-31, 67-69).

4

residence searched as long as Affiant Officers were not transporting him. Affiant Officers agreed and requested Uniform Patrol Officer to arrive to transport. Officer [Huffman] arrived and transported [Defendant] to 5124 North 51st Street. [Defendant] allowed Officer [Huffman] to perform a search of his person allowing Officer [Huffman] to check his pockets. Officer [Huffman] located a large amount of U.S. currency in the pockets of [Defendant].

    Affiant Officers were met by Sergeant [Collins] and Officers [Grossoehmig and Kyler] who assisted with the probation search. Officers gained entry into the residence via the garage door and were provided the security alarm to the residence by [Defendant] to disarm the alarm. Upon entry, Officers could detect an odor of marijuana right at the entry of the garage. Officers conducted a probation search of [the] residence and observed in the kitchen a currency bill counter, digital scale, and plastic Ziploc bags. Officers also observed in the garage several large approximately five pound heat sealed bags that were marked with different kind of marijuana strains. Due to the strong smell[/]odor of marijuana that could still be detected coming from the garage door and from the closet next to the garage door, Sergeant [Collins] conducted a further check of the closet and observed a loose piece of wood and loose grout on the bottom of the closet. Sergeant [Collins] was able to remove the loose piece of wood that just pulled out and could observe a large package of marijuana that appeared to be heat sealed behind the closet wall. Sergeant [Collins] could also smell the odor of marijuana from underneath the closet wall. Officers spoke to [Defendant] who refused to tell Officers how to obtain entry in the false void behind the closet wall. Affiant Officers know that seizure of the marijuana cannot be done without damage to the wall[.]

(Ex. 1). After obtaining a Search Warrant (Ex. 2; TR. 49) based upon the above application, the officers returned to the residence to search the "void." Using a steel ram, Sergeant Collins opened the area in the closet, revealing a room containing approximately eleven pounds of sealed marijuana in fourteen baggies, approximately $66,000 to $67,000 in cash in the studs of the wall, alcohol, and jewelry. (TR. 34, 70-71).

Defendant's motion requests suppression of the warrant and all evidence obtained from the search of the residence on October 14, 2016. At the hearing, the parties stipulated that Defendant has standing to challenge the search of the 5124 North 51st Street residence. (TR. 11). Defendant does not dispute that he consented to a probation search of his residence. (TR. 153). However, Defendant argues that because he has two residences, he lacked informed consent as to which address he consented to be searched. ([Filing No. 53](#) at p. 2). Defendant further argues that as soon as officers entered Defendant's residence and smelled marijuana, the "probation search" ended and became a "law enforcement" search that immediately required officers to

back out of the residence and obtain a search warrant. (Filing No. 53 at pp. 12-13). Finally, Defendant requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, (1978), arguing that officers withheld facts and provided false facts to the judge who authorized the search warrant. (Filing No. 25 at p. 3).

## ANALYSIS

### I. Consent to Search the Residence at 5124 North 51st Street

"It is fundamental that the Fourth Amendment does not prohibit a warrantless search of a residence where police obtain a resident's voluntary consent." *United States v. Kelley*, 594 F.3d 1010, 1013 (8th Cir. 2010). Defendant does not dispute that he consented to a probation search of his residence. Nor does Defendant argue that his consent was involuntarily procured through threats or coercion. Instead, Defendant argues that because he has two residences, he did not knowingly consent to the search because he believed the officers intended to search his residence on Butler Street, rather than his residence at 5124 North 51st Street.

"Whether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)(quoting *United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004). "The focus is not whether [the defendant] subjectively consented, but rather, whether a reasonable officer would believe consent was given and can be inferred from words, gestures, or other conduct." *Id.* (quoting *United States v. Guerrero*, 374 F.3d 584, 588 (8th Cir. 2004); see also *United States v. Rodriguez*, 834 F.3d 937, 940 (8th Cir. 2016)("[T]he ultimate inquiry is not whether the defendant subjectively consented, but whether 'a reasonable officer would believe consent was given.'").

The undersigned magistrate judge finds that a reasonable officer would have believed Defendant consented to the search of his 5124 North 51st Street residence. Defendant told his probation officer in July 2016 that he had moved to 5124 North 51st Street. Three months later, on October 14, 2016, Defendant reported to a scheduled meeting with Probation Officer Kossow, and consented to Kossow's request to search his "residence." Defendant continued to agree to the search, despite his agitation when Officers Brown and Hutton arrived in the probation office. Defendant further stated that they could "search anything they want," so long as he did not have to ride with Brown and Hutton. (TR. 60).

6

Defendant argues that this consent was invalid because no one ever told him which address officers intended to search. ([Filing No. 53 at p. 5](#)). However, even if Defendant thought he had consented to a search of his residence on Butler Street, he certainly would have realized that this residence was not the subject of the search request when Officer Huffman drove Defendant to his 5124 North 51st Street residence. The undisputed testimony from Officer Hutton, Officer Brown, and Probation Officer Kossow reflects that Defendant made no statements or gestures in an attempt to revoke his consent or otherwise indicate that he did not want a search to take place after arriving at the 51st Street residence.[2] Instead, Defendant affirmatively told Kossow that the easiest way to access the 51st Street residence was through the garage. Defendant also told Kossow to use the garage door opener that had been retrieved from his vehicle (which he had also consented to be searched). Defendant also provided the security code to deactivate the security alarm once officers entered the 51st Street residence.[3] Based on Defendant's conduct, a reasonable officer would believe that Defendant had given consent to search the residence at 5124 North 51st Street.

Defendant next argues that as soon as officers entered Defendant's residence and smelled marijuana, any "probation search" ended and became a "law enforcement" search, which required officers to immediately back out of the residence and obtain a warrant. ([Filing No. 53 at pp. 12-13](#)). Defendant cites *United States v. Vincent*, 167 F.3d 428 (8th Cir. 1999), for the proposition that "the Eighth Circuit requires the court to 'determine search was conducted for a probationary purpose and not merely for investigative purposes and the pretense of furthering the goals of probation.'" ([Filing No. 53 at p. 9](#)).[4] The Supreme Court, in *United States v. Knights*, 534 U.S. 112, 121 (2001), specifically rejected the view that the Fourth Amendment requires a

---

[2] Defendant asserts that he was placed inside a police cruiser in handcuffs and thus was not given an opportunity to withdraw his consent. (TR. 147). In *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007), the Eighth Circuit concluded that, "Even assuming that the searching officers had some independent duty to ensure [Defendant] an opportunity to withdraw consent after the search began—and [Defendant] offers no authority suggesting that such a duty exists," Defendant, who was sitting in the police cruiser, made no attempt to attract the attention of the officers once the search began. "[Defendant] was at least obligated to make some effort to communicate an intent to withdraw his consent." *Id.* In this case, Defendant did not attempt to withdraw consent when Kossow spoke to him to obtain the security alarm code, nor was there any evidence showing that Defendant attempted to get anyone's attention during the search in order to withdraw consent.

[3] While there was conflicting testimony as to who actually entered the alarm code, it is clear that Defendant provided it to either Kossow or the OPD officers. The undisputed evidence shows that the alarm was deactivated.

[4] The Court notes that Defendant misattributes this quote from *United States v. Replogle*, 301 F.3d 937, 939 (8th Cir. 2002) to *Vincent*, 167 F.3d at 428.

7

court to make such a distinction. Instead, the Supreme Court concluded that a warrantless search of a probationer's property, whether it is for investigatory or probationary purposes, is reviewed for reasonableness under the general Fourth Amendment approach of examining the totality of the circumstances. See *Knights*, 534 U.S. at 118-121 (holding that the Fourth Amendment does not require the State to choose between its "dual concern[s]" of furthering probationer's successful completion of probation and its concerns that a probationer is "more likely to engage in criminal conduct than an ordinary member of the community."). Pursuant to *Knights*, "no more than reasonable suspicion" that a "probationer subject to a search condition is engaged in criminal activity" is required to conduct a warrantless search of a probationer's residence. *Id.* at 121.[5] However, in this case, the Court need not address the reasonableness of the warrantless search pursuant to *Knights* because Defendant admits he consented to the probation search. As discussed above, officers reasonably believed this consent was to search Defendant's residence at 5124 North 51st Street, and Defendant did not make any statements or take action indicating he had revoked his consent. Therefore, the undersigned magistrate judge concludes that the warrantless search of Defendant's residence was permissible under the Fourth Amendment. See *Kelley*, 594 F.3d at 1013 (8th Cir. 2010)("[T]he Fourth Amendment does not prohibit a warrantless search of a residence where police obtain a resident's voluntary consent.").

**II. Scope of Consent**

Next, the undersigned magistrate judge must determine the scope of Defendant's consent. Under the Fourth Amendment, the scope of consent is measured by objective reasonableness, "an inquiry that asks what 'the typical reasonable person [would] have understood by the exchange between the officer and the suspect.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016)(quoting *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005). "[G]eneral consent to a search does not give law enforcement officers license to destroy property." *Zamora-Garcia*, 831 F.3d at 983 (citing *United States v. Guevara*, 731 F.3d 824, 830 (8th Cir. 2013)). "Cutting or destroying an object during a search requires either explicit consent for the destructive search or articulable suspicion that supports a finding that probable cause

---

[5] But see *Samson v. California*, 547 U.S. 843, 850 (2006)(noting that, "Because the search at issue in *Knights* was predicated on both the probation search condition and reasonable suspicion, we did not reach the question whether the search would have been reasonable under the Fourth Amendment had it been solely predicated upon the condition of probation.").

exists to do the destructive search." *Id.* Probable cause exists "when the facts available to [police] would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Id.* "It is a 'practical and common-sensical standard' based on 'the totality of the circumstances.'" *Guevara*, 731 F.3d at 830 (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)). "All that is required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.*

During the initial search of Defendant's residence pursuant to his consent, Sergeant Collins discovered a package of marijuana in a closet behind a loose piece of wood leading to a "void." When Officers asked Defendant how to access the "void," he refused. According to the officers' testimony, they believed that they would have to damage the wall in order to continue their search. The undersigned magistrate judge agrees with Defendant's assertion that his conduct demonstrated that he did not consent to further search of the "void." However, at the time the officers discovered the void, they had probable cause to continue to search in a destructive way. Prior to searching the void, the officers testified that they smelled a strong odor of raw marijuana immediately upon entering the residence near that closet, and noticed that the odor dissipated as they moved farther away from that area. The officers also observed items in the residence that they know from their training and experience are commonly used for packaging marijuana, including a digital scale, a heat-sealing machine, and a money counter. Officers also found empty heat-sealed bags in the garage labeled with names of different marijuana strains. The officers found $700 on Defendant's person and approximately $5,500 in his vehicle. Additionally, Defendant was on state probation after pleading no contest to possession of more than one pound of marijuana. These circumstances, in addition to Sergeant Collins' actual observation of a package of marijuana in the void in the closet, would lead a reasonable officer to believe there was a "fair probability" that drugs were hidden in the void. Nonetheless, in an abundance of caution, the officers obtained a search warrant, supported by probable cause, before destructively searching the void. Therefore, the undersigned magistrate judge concludes that the search (and execution of the search warrant) was permissible under the Fourth Amendment. See, e.g., *Illinois v. Gates*, 462 U.S. 213, 238 (1983)(stating probable cause for a warrant exists when the totality of the circumstances provides sufficient facts to lead a prudent person to believe there is a fair probability that contraband or other evidence of a crime will be found).

### III. Request for *Franks* Hearing

The undersigned magistrate judge concludes that officers were not required to obtain a warrant before searching the void in this case. Even if the search warrant obtained by the officers was required, it was supported by a showing of probable cause. However, Defendant argues that facts were withheld from, and false facts provided to, the judge who authorized the search warrant, and therefore seeks suppression of the warrant as well as a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, (1978). (Filing No. 25 at p. 3). A criminal defendant may request a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination. See *Franks*, 438 U.S. at 155-56. In order to obtain a *Franks* hearing, a defendant must make a substantial preliminary showing that (1) the affiant "knowingly and intentionally" made false statements or made them in "reckless disregard for the truth" and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause. *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013)(citing *Franks*, 438 U.S. at 155-56). "The requirement of a substantial preliminary showing is not lightly met[.]" *Id.* (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)).

Defendant argues that officers presented false and misleading facts to the judge who authorized the search warrant. (Filing No. 25 at p. 3). Specifically, Defendant argues that because Kossow did not tell the officers that Defendant was a "known gang member," the affidavit's statement that "Officer Kossow . . . advised that she had known 40th Ave Crip gang member [Defendant] . . . inside her office on a probation visit" was false. Defendant does not challenge whether the gang affiliation information is true; rather, Defendant argues that the statement is misleading because the gang information did not come from Kossow. However, Officer Brown and Officer Hutton, the drafters of the affidavit, each testified that the "known gang member" information came from their own personal knowledge (gathered as a result of previous contacts with Defendant) of Defendant's affiliation with the 40th Ave. gang. (TR. 36, 57). The information arguably relevant to a finding of probable cause is that Defendant is a "known gang member;" whether that information came from Kossow or the officers themselves is irrelevant to a finding of probable cause.

Defendant also argues that the affidavit's description that Sergeant Collins observed a "large package of marijuana" in the void behind the closet wall is misleading because the officers could not tell with certainty how large the bag was. Defendant argues possession of a "small quantity of marijuana is a minor infraction." (Filing No. 53 at p. 19). The exact size of the package of marijuana is immaterial to a finding of probable cause, as any amount of marijuana is illegal for Defendant to possess in Nebraska (and is also a violation of his terms of his probation). See Neb. Rev. Stat. § 28-416; see also *United States v. Briscoe*, 317 F.3d 906, 908 (8th Cir. 2003)(concluding the discovery of marijuana seeds and stems in defendant's garbage "were sufficient stand-alone evidence to establish probable cause.").

Defendant also lists a number of items that he believes were fatally omitted from the affidavit, including: omitting that OPPD utilities at 5124 North 51st Street were under a woman's name; using "large amount" instead of the exact quantity of currency found on Defendant's person; and omitting that a drug canine was run through the residence. (Filing No. 25 at pp. 3-4; Filing No. 53 at pp. 17-19). The above omitted items cited by Defendant are not material or necessary to a finding of probable cause. The OPPD record is irrelevant, as there is no dispute that Defendant lived at the residence at 5124 North 51st Street. There is no requirement that officers include the exact amount of currency found on Defendant's person, and further, the undersigned magistrate judge concludes that $700 is a "large" amount of currency to carry in one's pockets. Finally, the information that officers ran a canine through the residence is not necessary to a probable cause finding. "A law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not." Tech. *Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2011). In consideration of the above, the undersigned magistrate judge finds that Defendant has not made a "substantial preliminary showing" pursuant to *Franks*.

When relying on an affidavit to establish probable cause, "the probable cause determination must be based upon only that information which is found within the four corners of the affidavit." *United States v. Stults*, 575 F.3d 834, 843 (8th Cir. 2009). The information within the four corners of the affidavit presented to the signing judge established probable cause to search the void. The affidavit provided information that: officers were familiar with Defendant from prior contacts, knew he was on probation, and knew he was living at 5124 North 51st Street and agreed to a search; officers recovered a large amount of currency in Defendant's

11

pockets; officers detected an odor of marijuana at the entry of the garage of the residence; officers observed in the kitchen a currency bill counter, and digital scale; officers observed in the garage heat sealed bags marked with different kind of marijuana strains; and Sergeant Collins observed a package of marijuana in a void behind the closet wall where the odor was coming from. Considering the totality of the circumstances, the above facts demonstrate the existence of a "fair probability that contraband or evidence of a crime will be found[.]" *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Accordingly,

**IT IS HEREBY RECOMMENDED** to Chief Judge Laurie Smith Camp that Defendant's Motion to Suppress Warrant and Request for A *Franks* Hearing (Filing No. 24) be denied.

Dated this 14th day of November, 2017.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.